**UNITED STATES of America, Appellee,**

v.

**Kenneth Wayne CROPPER,
Defendant–Appellant.**

**Nos. 128, 222, Dockets 94–1035, 94–1037.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 3, 1994.

Decided Dec. 16, 1994.

Terence S. Ward, Asst. Federal Public Defender, Hartford, CT (Thomas G. Dennis, Federal Public Defender, Hartford, CT, of counsel), for defendant-appellant.

Nora R. Dannehy, Asst. U.S. Atty., Hartford, CT (Christopher F. Droney, U.S. Atty., New Haven, CT, of counsel), for appellee.

Before: MESKILL, MAHONEY, and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge:

Kenneth Wayne Cropper entered two separate guilty pleas in the United States District Court for the District of Connecticut (Albert V. Covello, *Judge*) to indictments for theft of interstate goods. On August 25, 1993, he pled guilty in Connecticut to stealing an interstate shipment of computer components in California, in violation of 18 U.S.C. § 659. Then, on November 12, 1993, he pled guilty in the same court to stealing an interstate shipment of automobile parts in Georgia, also in violation of 18 U.S.C. § 659. Cropper's guilty pleas were consolidated in the Connecticut District Court for sentencing. He was sentenced to 46 months' imprisonment.

Cropper solely appeals from the sentence, arguing that the court improperly enhanced his base offense level by two points for "more than minimal planning." *See* U.S.S.G. § 2B1.1(b)(5).

We agree that Cropper's crime did not involve more than minimal planning. Accordingly, we vacate and remand for resentencing.

## BACKGROUND

In June 1991, Guaranteed Air Freight, a San Francisco forwarding company handling interstate shipments of goods, fired Kenneth Wayne Cropper. Cropper became a cab driver, but he vowed revenge upon his former employer, who, he claimed, owed him several thousand dollars in back pay.

In the early morning hours of July 6, 1991, while Cropper was driving home from a local bar, he got his chance. As he passed Guaranteed Air Freight's warehouse, he remembered that he still had the keys to the warehouse. Cropper drove his yellow taxicab to his former employer's well-lighted ware-

house, backed the taxicab onto the loading ramp, opened the warehouse door with his keys, and drove into the warehouse.

Once inside, Cropper turned off the warehouse's outside lights, and turned his attention to the booty. He put on a pair of rubber surgical gloves that he found inside the warehouse, and began to load new computer equipment, still in boxes, into his cab. Unfortunately for Cropper, his cab was too small to hold the awkwardly packaged equipment, so he had to cut away the plastic covering, remove the computer parts from 18 separate boxes, and then load them into his cab. The haul included nine printers, seven monitors, nine computers, nine keyboards, eight adapters, and nine disc drives, worth a total of $37,622.12. Cropper also disconnected the warehouse telephones, stole two of them, and made his getaway.

After dropping off most of the loot at his home, Cropper drove 30 miles to the house of Grey Homan, his new employer at Yellow Cab Company, in Novato, California, and gave Homan a computer to settle an outstanding debt.

Cropper then went on a spree. On September 13, 1992, in Conley, Georgia, he stole a tractor-trailer ($36,000 value) loaded with automobile parts ($120,000 value) as well as a .22 caliber pistol and the trailer owner's clothes. Cropper used the truck in several other escapades in the Atlantic and New England states. He was finally arrested in Connecticut on October 9, 1992, while trying to steal a trailer loaded with potatoes. A few weeks later, Cropper confessed to stealing the computer components from Guaranteed Air Freight's warehouse.

The government indicted Cropper for theft of interstate goods, 18 U.S.C. § 659, in both the Northern District of California and the Northern District of Georgia. The two cases were consolidated and transferred for plea and sentencing to the United States District Court for the District of Connecticut, pursuant to Fed.R.Crim.P. 20. Cropper pled guilty to both indictments.

At sentencing, the district court accepted the presentence report ("PSR"), which calculated Cropper's Guideline range by combining the amount of loss and characteristics from both offenses into a single adjusted offense level of 15. This included a two-level enhancement because the California warehouse theft involved "more than minimal planning." U.S.S.G. § 2B1.1(b)(5). The enhancement was based on the following facts: "he kept the key after termination of employment, had planned on using the taxicab to transport the computers and had used plastic gloves so that he would leave no fingerprints on any equipment left behind." Joint Appendix p. 83, ¶ 47.

Cropper contested the two-level enhancement. He denied planning the crime, and argued that: (1) on the night of the California theft, he was out drinking in a bar about four blocks from Guaranteed Air Freight's warehouse; (2) he impulsively decided to commit the crime; (3) he did not keep his former employer's keys with the intent of committing a crime; (4) he did not know what he would find in the warehouse worth stealing; (5) he did not bring the rubber gloves to the warehouse, but just found them there; and (6) he often used his taxicab for personal use, and did not specifically obtain the taxicab to commit the crime.

The district court found Cropper's arguments unpersuasive and approved the enhancement, stating:

> With respect to the matter of more than minimal planning, the Court will rely on the cumulative effect of the possession of the key, the timing of the burglary, the disabling of the telephone, the use of the gloves to avoid fingerprint detection, the use of the particular vehicle, the matter of unpackaging the stolen material, and the transportation of some distance, all in their totality reflecting more than minimal planning.

Joint Appendix p. 65. Cropper's adjusted offense level of 15, when combined with criminal history category V, yielded a range of 37 to 46 months. The district court sentenced him to 46 months' imprisonment. Cropper appeals.

## DISCUSSION

Cropper contends that the facts of the California theft do not support the two level

enhancement for more than minimal planning. We agree.

We review a district court's findings of fact for clear error, and accord due deference to the court's application of the facts to the law. *United States v. Parker*, 903 F.2d 91, 103 (2d Cir.), *cert. denied*, 498 U.S. 872, 111 S.Ct. 196, 112 L.Ed.2d 158 (1990). We will not overturn a district court's application of the Guidelines to the facts of the case unless we find an abuse of discretion. *Id; see also United States v. Beauchamp*, 986 F.2d 1, 5 (1st Cir.1993) (reviewing the application of the more than minimal planning enhancement for clear error).

■ A sentencing judge is empowered to increase a defendant's offense level by two points when the offense involved "more than minimal planning." U.S.S.G. § 2B1.1(b)(5). More than minimal planning requires that the defendant: (1) engaged in more planning than the offense would require in its simple form; or (2) took significant steps to conceal the crime, excluding conduct that constitutes obstruction of justice. *See id.*, comment n. 1 (referring to U.S.S.G. § 1B1.1, comment n. 1(f)).

■ The enhancement is usually applied to sophisticated crimes or offenses requiring repeated acts over a period of time. *See, e.g., United States v. Brach*, 942 F.2d 141, 145 (2d Cir.1991) (scheme that occurred over many months to move a business that involved securing a $250,000 advance from the defrauded party); *United States v. Bakhtiari*, 913 F.2d 1053, 1063 (2d Cir.1990) (defendant had numerous contacts with broker in which defendant impersonated a State Department employee and provided false information), *cert. denied*, 499 U.S. 924, 111 S.Ct. 1319, 113 L.Ed.2d 252 (1991). *See also United States v. Lennick*, 917 F.2d 974, 979 (7th Cir.1990) (noting that courts generally apply the enhancement "to factual scenarios involving clear examples of repeated or complex criminal activity").

■ The record indicates that Cropper's California warehouse theft involved no more planning than the simple crime of theft, and that he did not take significant steps to conceal the crime. Cropper's crime was not sophisticated, and it did not involve repeated acts over a period of time. It was a simple—one is tempted to say simple-minded—theft. While he was driving by the warehouse, Cropper decided, on an impulse, to break in and recover what Guaranteed Air Freight "owed" him.

He drove up to a well-lighted warehouse in a conspicuous yellow taxicab that was too small to carry the boxes of computer components he stole, delaying him while he unpacked the components before he could load them into the cab. If this scenario suggests planning at all, the best it could aspire to would be "minimal," and certainly not "more than minimal." *See United States v. Maciaga*, 965 F.2d 404, 406–07 (7th Cir.1992) (a bank employee who, in the course of stealing from the bank at night, deactivated the alarm system, destroyed customer deposit slips, hid deposit bags in the trunk of his car, and lied to the police in order to throw them off his trail, did not engage in more than minimal planning).

The California theft had the same impulsive, harebrained *modus operandi* as the Georgia theft, which the government conceded involved no more than minimal planning. In the Georgia incident, Cropper came upon a tractor-trailer with its key in the ignition. He popped the tractor window, and drove off with the vehicle. We see little difference between the sophistication level in the two crimes.

■ The district court based its determination that the enhancement was proper on "the cumulative effect" of several factors "all in their totality reflecting more than minimal planning." Our review of the case leads us to the opposite conclusion.

The district court noted that, even after he was fired, Cropper still kept the key to Guaranteed Air Freight's warehouse. This practice, however, is not unusual or suspicious. The government now urges that Cropper kept the key with the intent to burgle the warehouse later. Neither the district court nor the PSR made this finding, and there is nothing in the record to support it.

The district court also mentioned that the theft occurred at night. This was hardly

noteworthy when it is recalled that Guaranteed Air Freight's employees filled the warehouse during the day. Because an enhancement for more than minimal planning requires more than just committing the crime when no witnesses are present, the nighttime feature does not support the enhancement. *See* U.S.S.G. § 1B1.1, comment n. 1(f).

The next aggravating factor was that Cropper disabled the warehouse telephones. From this, the district court inferred that Cropper was attempting to avoid detection. Apart from the fact that the telephones posed no threat to Cropper, disconnecting them was the only way that Cropper could steal them.

The district court also relied on what was arguably the most damning evidence of more than minimal planning, the rubber surgical gloves. But if Cropper had really planned the offense, he would have brought gloves with him. That he saw a way to prevent leaving fingerprints after he found the gloves at the warehouse may pay tribute to his resourcefulness, but it does not indicate planning. *See generally Maciaga,* 965 F.2d at 407–08 ("More than minimal planning" does not include steps taken to avoid detection unless the defendant contemplated those steps in advance).

What gives lie to any notion that this was a planned job is Cropper's use of his taxicab to steal the computer parts. The cab was too small to carry the boxes that contained the computer components. Had Cropper truly planned the crime, he would have brought a larger vehicle to save the time he wasted unpackaging and loading the individual computer parts. In addition, if planned, Cropper would not have used a conspicuous yellow cab to pull into the well-lighted warehouse in the middle of the night.

Finally, the district court seemed impressed that Cropper transported the stolen computer parts 30 miles. Cropper's 30–mile detour to the home of Homan, his current employer, might be relevant to the enhancement if he did so to conceal the offense or as part of a plan. *See United States v. Streich,* 987 F.2d 104, 108 (2d Cir.1993) (per curiam). Neither is true here. The defendant in *Streich* drove 70 miles from the crime scene for the purpose of hiding the stolen computer parts at his mother's house. Cropper, however, transported the components to Homan to bring the fruits of his crime to market, not to conceal the crime. It is also significant that the government has conceded that there was no evidence that Cropper had arranged to sell the computer parts to Homan before he stole them.

All these factors suggest that Cropper's conduct was a spontaneous, reckless caper. His plan was a Monet impressionist rendering, fashioned as the thoughts occurred to him. It was certainly not a Manet of detailed execution. Perhaps there was some truth to the psychological evaluation prepared for one of his earlier PSRs where he was described as "stuck in an adolescent posture" and in need of help to control his "impulsivity."

Because the facts did not indicate that Cropper engaged in "more than minimal planning," the district court abused its discretion in applying the two level enhancement.

## CONCLUSION

We vacate the judgment of sentence, and remand for resentencing consistent with this opinion.

VACATED and REMANDED.